UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
U.S. BANK NATIONAL ASSOCIATION, AS
TRUSTEE, AS SUCCESSOR IN INTEREST TO
BANK OF AMERICA, N.A., AS TRUSTEE
FOR THE REGISTERED HOLDERS OF
CREDIT SUISSE FIRST BOSTON
MORTGAGE SECURITIES CORP.,
COMMERCIAL MORTGAGE PASS-
THROUGH CERTIFICATES, SERIES 2007-C2,
ACTING BY AND THROUGH ITS SPECIAL
SERVICER, TORCHLIGHT LOAN SERVICES,
LLC,

                    Plaintiff,                              20-cv-3577 (PKC)

          -against-                                        OPINION AND
                                                           ORDER

KEYBANK, NATIONAL ASSOCIATION, AS
SUCCESSOR BY MERGER TO KEYCORP
REAL ESTATE CAPITAL MARKETS, INC.
AND BERKADIA COMMERCIAL
MORTGAGE, LLC,

                    Defendants.
------------------------------------------------------------x

CASTEL, U.S.D.J.

          This action relates to a $47 million loan on commercial real estate located at 300-

308 East Fordham Road in the Bronx, secured by a mortgage.  The servicing of the mortgage

loan is governed by a 313-page Pooling and Service Agreement (the "PSA").  The action is

brought on behalf of the trustee under the PSA by a "Special Servicer" against a "Master

Servicer" and a "Sub-Servicer" for various alleged breaches of contract.  The borrower is not a

party to the action.  This is the Court's decision on the defendants' motions to dismiss.

          Plaintiff U.S. Bank National Association, the trustee ("U.S. Bank" or "Trustee"),

brings this action, by and through its special servicer Torchlight Loan Services, LLC

1

("Torchlight" or "Special Servicer"), against defendants KeyBank, National Association

("KeyBank" or "Master Servicer") and Berkadia Commercial Mortgage, LLC ("Berkadia" or

"Sub-Servicer," and together with KeyBank, the "Servicers").  Plaintiff alleges that KeyBank

and Berkadia breached their obligations as the Master Servicer and Sub-Servicer of a mortgage

loan under the PSA.  Plaintiff's allegations fall into two categories: first, that the defendants

failed to ensure the borrower's compliance with an agreement that established a lockbox as

additional security for the repayment of the loan (the "Lockbox allegations"), and second, that

the defendants failed to immediately reject the property appraisals that were obtained in advance

of a refinancing transaction and were allegedly improper (the "appraisal allegations").  Plaintiff

seeks compensatory damages, indemnification against all claims and losses sustained as a result

of the defendants' actions, and "disgorgement" of legal fees and other expenses plaintiff

previously paid to the defendants.

KeyBank and Berkadia each move to dismiss plaintiff's Third Amended

Complaint (the "Complaint"), asserting, among other arguments, that Torchlight lacks the

authority under the PSA to bring this action on U.S. Bank's behalf, that the Lockbox allegations

fail to state a claim for breach of contract, and that the plaintiff's claims are barred by the statute

of limitations.

On these motions, the Court principally concludes that:

- The Trustee by and through Torchlight as Special Servicer has the authority to assert claims under the PSA against KeyBank and Berkadia.

- The PSA did not require the Trustee or Torchlight to declare an "Event of Default" prior to initiating this action.

- The PSA's limitation of liability clause does not bar plaintiff's claims.

- Plaintiff's Lockbox allegations plausibly allege a breach of the PSA based on the defendants' failure to monitor and take appropriate action with

respect to the borrower's purported diversion of tenant rent payments from the Lockbox to its own accounts (Counts I, II, III, IV, V, VI, and VII).

- Plaintiff's breach of contract claims based on alleged waivers or modifications of agreements with the borrower are time barred in their entirety (Counts II and III).

- Plaintiff's remaining breach of contract claims based on the Lockbox are time barred to the extent they are based on alleged conduct that occurred prior to March 20, 2014 (Counts I, IV, V, and VII).

- Plaintiff's appraisal allegations are barred by collateral estoppel (Counts I, II, III, IV, V, VI, and VII). The breach of contract claims based on the appraisals are also time barred (Counts I, II, III, IV, V, and VII).

Thus, the motions to dismiss will be granted in part and denied in part.

Specifically, the motions are granted except with respect to the sixth cause of action seeking indemnification based on the plausible Lockbox allegations and the first, fourth, fifth, and seventh causes of action based on the plausible Lockbox-related breaches that allegedly occurred on or after March 20, 2014.


BACKGROUND

For purposes of these motions to dismiss, the Court accepts the Complaint's well-pleaded allegations as true and draws all reasonable inferences in favor of the non-movant plaintiff. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); In re Elevator Antitrust Litigation, 502 F.3d 47, 50 (2d Cir. 2007).

The PSA at the center of this action was executed on May 1, 2007, by (1) Credit Suisse First Boston Mortgage Securities Corporation ("Credit Suisse"), as Depositor; (2) Keycorp Real Estate Capital Markets, Inc. ("KeyCorp"), as Master Servicer No. 1; (3) Wachovia Bank, National Association, as Master Servicer No. 2; (4) ING Clarion Partners, LLC ("ING"),

as Special Servicer; and (5) Wells Fargo Bank, N.A. ("Wells Fargo"), as Trustee.  (ECF 110, Ex. 1; TAC ¶ 9.)[1]

      After the PSA was executed, U.S. Bank succeeded Wells Fargo as Trustee.  (TAC ¶ 15.)  Torchlight succeeded ING as Special Servicer and proceeded to serve as Special Servicer at all relevant times.  (TAC ¶ 19.)  In addition, KeyBank succeeded Keycorp by merger and became a Master Servicer under the PSA.  (TAC ¶ 17.)  Berkadia entered into a sub-servicing agreement with KeyBank (the "Sub-Servicing Agreement") and, at all times relevant to the Complaint, was the Sub-Servicer with respect to the particular loan at issue in this action.  (TAC ¶ 18.)  The Sub-Servicing Agreement required Berkadia to comply in all material respects with the PSA.[2]  (PSA § 3.22(a).)

      The PSA's Preliminary Statement describes that the "Depositor desires, among other things, to: (i) establish a trust fund, consisting primarily of the ["Original Mortgage Loans"] and certain related rights, funds and property; (ii) cause the issuance of mortgage pass-through certificates in multiple classes, which certificates will, in the aggregate, evidence the entire beneficial ownership interest in such trust fund; and (iii) provide for the servicing and administration of the mortgage loans, including the Original Mortgage Loans, and the other assets that from time to time constitute part of such trust fund."  (PSA at 10; TAC ¶ 10.)  Under the agreement, the Trustee has legal title to the assets comprising the trust fund (the "Trust Fund") and holds them for the benefit of the Certificateholders.  (PSA § 2.01; TAC ¶¶ 13-15.)

---

[1] On a motion to dismiss, a court "may review only a narrow universe of materials," which includes documents incorporated in the complaint, matters of which judicial notice may be taken, and documents that are "integral" to the complaint even if not expressly incorporated.  Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (stating that a document is "integral" to a complaint where the complaint "relies heavily upon its terms and effect").  The Complaint does not annex the PSA. Because the Complaint refers to the PSA and bases its claims of breach on its terms, the Court may properly consider the PSA on these motions.
[2] For the sake of clarity, the Court will refer directly to the PSA when describing Berkadia's contractual obligations.

4

The PSA requires KeyBank and Berkadia to administer and service loans owned by the Trust in accordance with the "Servicing Standard." (PSA § 3.01(a), (b); TAC ¶¶ 24-25.) The Servicing Standard requires the Servicers to service and administer the loans pursuant to the terms of the PSA and in the best interests of the Certificateholders as a whole, in accordance with applicable law, and in the same manner and with the same care, skill, prudence, and diligence with which they service similar mortgage loans for other third-party loan portfolios or other loans they own, whichever is higher. (PSA § 1.01; TAC ¶ 26.)

KeyBank is also required to "monitor the performance and enforce the obligations of" Berkadia. (PSA § 3.22(c); TAC ¶ 32.) The PSA further provides that KeyBank is "obligated and liable to the Trustee and the Certificateholders for the performance of [its] obligations and duties under [the PSA] as if [it] alone were servicing and administering the Mortgage Loans . . . for which it is responsible." (PSA § 3.22(e); TAC ¶ 33.)

1. The Fordham Loan.

One of the mortgage loans held by the Trustee is a loan (the "Fordham Loan") extended to East Fordham DE LLC (the "Fordham Borrower"). (TAC ¶ 38.) The Fordham Loan is secured by a first priority mortgage against and security interest in all or substantially all of the real and personal property of the Fordham Borrower (the "Fordham Property"). (TAC ¶ 39.) KeyBank was the Master Servicer, and Berkadia was the Sub-Servicer, with respect to the Fordham Loan. (TAC ¶¶ 17-18.)

After the Fordham Borrower failed to make payments due under the loan documents relating to the Fordham Loan (the "Fordham Loan Documents") between January 11, 2011, and April 11, 2011, it requested modifications to the Fordham Loan Documents. (TAC ¶¶ 42-43.) On May 11, 2012, the Fordham Borrower, U.S. Bank (the "Lender"), and the guarantor

of the Fordham Loan executed an agreement (the "Fordham Loan Modification Agreement"), which, among other things, modified or waived certain terms and conditions of the Fordham Loan Documents.  (TAC ¶ 44; ECF 114, Ex. E.)  It provided that the Fordham Borrower would not be required to pay the default charges it had accrued so long as it paid all sums due under the Fordham Loan Documents in accordance with the terms of the Fordham Loan Modification Agreement and no other event of default occurred.  (TAC ¶ 49.)

        The Fordham Borrower was also permitted, so long as there was no "Event of Default," to prepay the Fordham Loan prior to the maturity date using the net proceeds received from either a "Permitted Sale Capital Event" or a "Refinancing Capital Event."  (TAC ¶ 52.)  For a Refinancing Capital Event, the "minimum Net Proceeds" were required to equal at least "94 percent of the as-stabilized value" of the Fordham Property.  (TAC ¶ 53.)  The as-stabilized value was to be determined by the average of two appraisals, one obtained by the Fordham Borrower and one obtained by the Lender.  (TAC ¶ 68.)

        2.   Plaintiff's Lockbox Allegations.

        The Fordham Loan Modification Agreement also established a lockbox as additional security for the repayment of the Fordham Loan.  (TAC ¶ 55.)  The terms for the repayment were memorialized in the Lockbox-Deposit Account Control Agreement, dated May 11, 2012 (the "Lockbox Agreement").[3]  (Id.; ECF 114, Ex. C.)  The Lockbox Agreement required the Fordham Borrower to direct its tenants to pay monthly rents directly into a deposit account (the "Deposit Account" or "Lockbox")[4] controlled by the Lender.  (Lockbox Agreement

---

[3] The Court may properly consider the Lockbox Agreement and the Fordham Loan Modification Agreement on these motions to dismiss for the same reasons it may consider the PSA; they are integral to and relied upon in the Complaint.  See Goel, 820 F.3d at 559; Chambers, 282 F.3d at 153.

[4] The Complaint appears to use the terms "Deposit Account" and "Lockbox" interchangeably.  The Lockbox Agreement defines the "Deposit Account" as "a depository account, for the benefit of Lender" bearing a certain account number.  (Lockbox Agreement § 2.01.)  It defines the "Lockbox" as "a unique U.S. Postal Service address . . . to be used for remittances which are to be deposited into the Deposit Account."  (Id. § 3.01.)

§§ 4.01, 4.02; TAC ¶ 56.)  Those deposited amounts were within "the sole dominion and control" of the Lender.  (Lockbox Agreement § 5.01; TAC ¶ 56.)  The Deposit Account created by the Lockbox Agreement superseded a previous lockbox created under the original loan agreement with the Fordham Borrower in March 2007.  (TAC ¶ 56.)

KeyBank and Berkadia, as the Servicers of the Fordham Loan, were required to monitor and administer the Lockbox in accordance with the Servicing Standard and ensure the Fordham Borrower complied with the Lockbox Agreement.  (TAC ¶ 57 (citing PSA § 3.01(b)); id. ¶ 60.)  The Complaint alleges that neither KeyBank nor Berkadia took any steps to monitor the Deposit Account or the Fordham Borrower's compliance with the Lockbox Agreement.  (TAC ¶ 61.)  It also alleges that the Fordham Borrower breached the Lockbox Agreement by "divert[ing] rents from the Lockbox to its own accounts" and merely using the Deposit Account as an account to which monthly payments were remitted.  (TAC ¶ 62.)  It further alleges that the defendants had actual and constructive knowledge of the Fordham Borrower's breach and did not provide notice of the breach to the Trustee as required by the PSA.  (TAC ¶ 63 (citing PSA § 3.21(a)).)

3.  <u>The Refinancing Capital Event and Plaintiff's Appraisal Allegations.</u>

The Fordham Borrower elected to prepay the Fordham Loan through a Refinancing Capital Event in or about January 2014.  (TAC ¶ 64.)  The Complaint alleges that the Fordham Borrower was not entitled to do so because it had defaulted under the Lockbox Agreement, and that the defendants failed to inform the Fordham Borrower of that fact. (TAC ¶¶ 65-66.)

As required for a Refinancing Capital Event, Berkadia and the Fordham Borrower procured appraisals of the Fordham Property from Cushman & Wakefield ("Cushman") and

Leitner Group, Inc. ("Leitner").  (TAC ¶¶ 68-69.)  Cushman sent its appraisal to Berkadia on or about January 24, 2014.  (TAC ¶ 85.)  On or about February 13, 2014, Leitner sent its appraisal to the Fordham Borrower, which then sent it to Berkadia.  (TAC ¶ 86.)  Berkadia provided copies of the appraisals to KeyBank shortly after it received them.  (TAC ¶ 94.)

        The Fordham Loan Modification Agreement required these appraisals to be "MAI appraisals," i.e., consistent with the professional standards governing the Members of the Appraisal Institute ("MAI"), and to calculate the "as-stabilized value" of the property.  (TAC ¶ 68.)  The Complaint alleges, however, that both appraisals improperly used "as-is" valuation methodologies.  (TAC ¶¶ 71-80.)  The Complaint also alleges that even if the appraisals could be read as reporting "as-stabilized" values, they would violate MAI professional standards.  (TAC ¶ 83.)

        The Complaint alleges that the defendants "failed to immediately reject" the appraisals and failed to inform the Fordham Borrower that the appraisals did not satisfy the terms of the Fordham Loan Modification Agreement, until on or about May 23, 2014.  (TAC ¶¶ 81-82, 92-93, 95.)  KeyBank also did not advise Berkadia that the appraisals were noncompliant, despite its obligation to monitor Berkadia's performance as the Sub-Servicer.  (TAC ¶ 96.)

        In the meantime, on or about May 8, 2014, Berkadia sent an "assignment package" to the Fordham Borrower that would, upon closing of the Refinancing Capital Event, assign the Fordham Loan to the Fordham Borrower's new lender.  (TAC ¶ 88.)  On the same day, Berkadia also sent a "payoff letter" stating the amount due under the Fordham Loan Modification Agreement.  (TAC ¶ 90.)  KeyBank prepared the payoff letter using the valuations set forth in the appraisals.  (TAC ¶ 91.)  The Complaint alleges Berkadia sent the payoff letter

and assignment package despite the fact that the Fordham Borrower had breached the Lockbox Agreement and therefore was not eligible to refinance the Fordham Loan.  (TAC ¶¶ 89-90.)

The Refinancing Capital Event was scheduled to close on June 11, 2014.  On May 23, 2014, Berkadia advised the Fordham Borrower that the appraisals incorrectly used the "as-is" methodology and would need to be updated.  (TAC ¶ 98.)  Berkadia stated that it was canceling its current payoff request calculation and that it would issue a new payoff statement upon receipt of updated appraisals using the "as-stabilized" methodology.  (Id.)  On June 10, 2014, Berkadia advised the Fordham Borrower that it would be "in touch" about the new payoff statement. (TAC ¶ 99.)  Then, on the scheduled closing date, Berkadia told the Fordham Borrower that KeyBank was reviewing the Fordham Borrower's request that it be allowed to repay the Fordham Loan on June 12 without incurring an additional month of interest and that Berkadia was expecting an updated payoff statement shortly.  (TAC ¶¶ 100-01.)

The Complaint alleges that both defendants breached the Servicing Standard because "any person exercising the bare minimum of care . . . would have immediately realized that neither of the [a]ppraisals satisfied the terms, conditions and requirements of the Fordham Loan Modification Agreement" and because the defendants should have rejected the Fordham Borrower's request to refinance in light of its breach of the Lockbox Agreement.  (TAC ¶¶ 102-06, 108.)

### 4.   The Fordham State Court Action.

On June 19, 2014, after the Refinancing Capital Event failed to close, the Fordham Borrower commenced an action against U.S. Bank, KeyBank, and Berkadia in the Supreme Court for the State of New York (the "Fordham State Court Action").  (TAC ¶ 109.) Torchlight was subsequently added as a defendant.  (Id.)  The Fordham Borrower sought several

forms of relief, including damages resulting from the alleged wrongful refusal of the state court

defendants to close on the Refinancing Capital Event and specific performance with respect to

the closing.  (TAC ¶ 112.)  The New York court enjoined U.S. Bank from commencing a

foreclosure action against Fordham Borrower or seeking other judicial relief.  That injunction

remained in place until March 19, 2019.  (TAC ¶ 115.)

       While not a model of clarity, the Complaint implicitly alleges that defendants'

actions and inactions resulted in the state court injunction which, in turn, assisted in enabling the

Fordham Borrower to dissipate millions of dollars of cash collateral securing the Fordham Loan.

(TAC ¶ 116.)  "As of May 1, 2020, the aggregate outstanding amount with respect to the

Fordham Loan was not less than $84,447,521."  (TAC ¶ 117.)


PROCEDURAL HISTORY

       Plaintiff commenced this action on May 7, 2020, and filed its first amended

complaint on May 8, 2020.  KeyBank and Berkadia filed motions to dismiss the first amended

complaint in August 2020.  Then-presiding Judge Torres granted plaintiff leave to file a second

amended complaint, and plaintiff did so on March 9, 2021.  Defendants again moved to dismiss.

In an Order of March 21, 2021, Judge Torres stated that "the Court [could not] determine, based

on the pleadings before it, whether it has diversity jurisdiction over this action."  (ECF 105.)  The

Court denied the motions to dismiss "without prejudice to renewal following the filing of an

amended complaint that properly sets forth the basis for diversity jurisdiction."  (Id.)

       On April 4, 2022, Plaintiff filed its Third Amended Complaint (the "Complaint")

and a supplemental letter addressing the jurisdictional issues raised by Judge Torres.  The

defendants filed motions to dismiss the Complaint, and the case was thereafter reassigned to the undersigned on November 7, 2022.

THIRD AMENDED COMPLAINT

The Complaint asserts seven causes of action.  The first alleges that Berkadia and KeyBank breached the PSA's Servicing Standard by (1) failing to monitor the Deposit Account and the Fordham Borrower's compliance with the Lockbox Agreement, (2) permitting the Fordham Borrower to proceed towards closing of the Refinancing Capital Event while it was in default under the Lockbox Agreement, and (3) failing to immediately reject the appraisals. (TAC ¶¶ 119-25.)

The second alleges that the defendants breached the provisions of the PSA that restrict the modification, waiver, or amendment of mortgage loan terms.  Section 3.20(b) of the PSA prohibited the defendants from granting any waiver or modification of any mortgage loan that would affect the amount or timing of any payment terms, result in release of the borrower from any material term, waive any rights with respect to any guarantor, or release or substitute any material collateral securing the mortgage loan.  (TAC ¶ 134.)  Section 3.20(e) prohibited the defendants from agreeing to any modification, waiver, or amendment of any mortgage loan that was not a "Specially Serviced Mortgage Loan" if the modification, waiver, or amendment would, among other things, affect the amount or timing of any payment of principal, interest, or other amount or result in the release of the lien of the mortgage on any material portion of the mortgage property without a corresponding principal prepayment.  (TAC ¶ 136.)  The Fordham Loan was not a Specially Serviced Mortgage Loan.  (TAC ¶ 137.)

The Complaint alleges that the defendants' failure to enforce the Lockbox Agreement effectively modified the terms of the Lockbox Agreement and released a valuable security interest securing the repayment of the Fordham Loan.  (TAC ¶¶ 132-33, 138.)  The Complaint also alleges that plaintiff has "disputed the allegations of [the] Fordham Borrower in the Fordham [State Court] Action that the requirements of the Fordham Loan Modification Agreement were either waived or modified so as to permit 'as-is' appraisals," but that "[i]f" the New York court determines that the terms were so waived or modified, "then such determination would establish that the requirements of the Fordham Loan Modification Agreement were either waived or modified by the acts and omissions of" the defendants in violation of sections 3.02(b) and (e).  (TAC ¶ 130-131, 135, 138.)

The third cause of action alleges that any modification, waiver, or amendment of the Fordham Loan Modification Agreement or Lockbox Agreement violated the Servicing Standard, and therefore breached section 3.20(d) of the PSA.  (TAC ¶¶ 146-47.)  Section 3.20(d) provides that all modifications, waivers, or amendments of any mortgage loan must be "effected in accordance with the Servicing Standard."  (PSA § 3.20(d).)

Plaintiff asserts its fourth and fifth causes of action against KeyBank only.  The fourth cause of action alleges that, pursuant to section 3.22(e) of the PSA, KeyBank is liable for any and all breaches of the PSA by Berkadia and with respect to any and all damages plaintiff suffered as a result of Berkadia's breaches.  (TAC ¶ 153.)  The fifth cause of action alleges that KeyBank breached its obligation under section 3.22(c) of the PSA to monitor and enforce the obligations of Berkadia as its Sub-Servicer.  (TAC ¶ 160.)

With respect to the first five causes of action, plaintiff alleges it has been damaged by the defendants' breaches, including because it incurred "substantial professional

fees and expenses" in defending the Fordham State Court Action and because it lost millions of dollars of cash collateral securing the Fordham Loan and in interest that should have been paid with respect to that loan.  (TAC ¶¶ 126-127, 139-140, 148-49, 154-55, 161-62.)   Plaintiff seeks compensatory damages, plus prejudgment interest at the statutory rate.  (TAC ¶¶ 128, 141, 150, 157, 163.)

The sixth cause of action alleges that the plaintiff and the Trust Fund are entitled to indemnification from KeyBank and Berkadia.  Section 6.03(c) of the PSA provides that the defendants must indemnify plaintiff and the Trust Fund from "any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related out-of-pocket costs, judgments, and any other out-of-pocket costs, liabilities, fees and expenses that any of them may sustain arising from or as a result of any willful misfeasance, bad faith or negligence . . . in the performance of [their duties under the PSA] or by reason of negligent disregard . . . of [their duties under the PSA] . . . ."  (PSA § 6.03(c); see also TAC ¶165.)  The Complaint alleges that the acts and omissions of the defendants "complained of herein" constitute such willful misfeasance, bad faith, negligent performance of their duties, and negligent disregard of their duties.  (TAC ¶¶ 167-68.)

Finally, the seventh cause of action alleges that the Trust Fund has indemnified KeyBank and Berkadia for legal fees and other expenses they incurred in connection with the Fordham State Court Action, and that, pursuant to section 6.03(a) of the PSA, the defendants were not entitled to such indemnification because the expenses were incurred by reason of bad faith, willful misconduct, negligent performance of their duties under PSA, and negligent disregard of their duties under the PSA.  (TAC ¶¶ 172-74.)  Plaintiff seeks a judgment requiring the defendants to "disgorge and repay to Plaintiff all amounts paid to or for their benefit in

connection with or relating to the defense of the Fordham [State Court] Action."  (TAC ¶¶ 176-77.)

DISCUSSION

A.  Diversity Jurisdiction.

          In granting plaintiff leave to file a third amended complaint to address "jurisdictional deficits," Judge Torres noted that the second amended complaint established that the defendants are citizens of Ohio, New York, Delaware, and Nebraska.  (ECF 105 at 1; see also TAC ¶¶ 2-3.)  However, the second amended complaint failed to adequately establish the plaintiff's citizenship because it did not demonstrate (1) that U.S. Bank, the Trustee, was a "real party in interest" under Rule 17, Fed. R. Civ. P., or (2) that Torchlight's stake in the litigation was sufficiently de minimis to foreclose consideration of its citizenship.  (ECF 105.)

          1.  Plaintiff U.S. Bank Is a Real Party to the
              Controversy for the Purposes of Diversity Jurisdiction.

          Under Rule 17(a)(1), "[a]n action must be prosecuted in the name of the real party in interest."  Rule 17(a)(1), Fed. R. Civ. P.  "This means that an action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right."  Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193 (2d Cir. 2003) (quotations omitted) (quoting 6A Charles Alan Wright, et al., Federal Practice & Procedure § 1543 (2d ed. 1990)).  As the Supreme Court has noted, Rule 17(a) provides that trustees of an express trust are real parties in interest "for procedural purposes."  Navarro Savings Association v. Lee, 446 U.S. 458, 462 (1980).  But a party that demonstrates it is a "real party in interest" for Rule 17 purposes "must also establish that it is a 'real and substantial party to the controversy' for the purposes of determining diversity jurisdiction.  Oscar Gruss, 337 F.3d at 193-94; see also Navarro, 446 U.S.

at 462 n.9 ("There is a 'rough symmetry' between the 'real party in interest' standard of Rule

17(a) and the rule that diversity jurisdiction depends upon the citizenship of real parties to the

controversy.  But the two rules serve different purposes and need not produce identical outcomes

in all cases.").

> "[A] trustee is a real party to the controversy for purposes of diversity jurisdiction,

when [it] possesses certain customary powers to hold, manage, and dispose of assets for the

benefit of others."  <u>Navarro</u>, 446 U.S. at 464.  Here, U.S. Bank possesses the requisite customary

powers because the PSA provides:

> The Depositor . . . does hereby assign, sell, transfer, set over and otherwise convey to the Trustee, without recourse, for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in to and under (i) the Original Mortgage Loans, (ii) the Mortgage Loan Purchase Agreements and (iii) all other assets included or to be included in the Trust Fund.

(PSA § 2.01(a); TAC ¶ 13); <u>see also</u> <u>Navarro</u>, 446 U.S. at 464 (concluding trustees possessed

customary powers because they were authorized "to take legal title to trust assets, to invest those

assets for the benefit of the shareholders, and to sue and be sued in their capacity as trustees");

<u>U.S. Bank National Association v. Nesbitt Bellevue Properties, LLC</u>, 859 F. Supp. 2d 602, 606-

07 (S.D.N.Y. 2012) (concluding trustee possessed customary powers because the relevant

pooling and servicing agreement provided that "'Depositor . . . does hereby . . . assign, sell,

transfer, set over, and otherwise convey to the Trustee . . . all the right, title and interest of the

Depositor' in the mortgage loans covered by the PSA and various related rights"); <u>Wells Fargo</u>

<u>Bank, N.A. v. 390 Park Avenue Associates, LLC</u>, 16-Civ-9112, 2017 WL 2684069, at *3

(S.D.N.Y. June 21, 2017) (relying on similar language to conclude trustee was a real party in

interest).  Accordingly, the citizenship of U.S. Bank will be considered for diversity jurisdiction

purposes.[5]

### 2.  Torchlight's Citizenship Will Not Be Considered Because Its Stake in the Litigation Is Sufficiently De Minimis.

The second amended complaint did not allege the citizenship of Torchlight or

establish that Torchlight's citizenship should not be considered in determining diversity

jurisdiction.  Judge Torres noted that plaintiff had not met its "burden of demonstrating, with

specific reference to the relevant PSA, that 'the Special Servicer's stake in the litigation' is

sufficiently de minimis to foreclose consideration of its citizenship in the diversity analysis."

(ECF 105 (quoting Nesbitt, 859 F. Supp. 2d at 608-09).)  Judge Torres also noted that "[a]s a

limited liability company, or LLC, Torchlight is deemed to be a citizen of each state of which its

members are citizens—thus, any amended pleading must include the citizenship of all of

Torchlight's constituent members."  (Id. at 2 n.1 (citing Haldelsman v. Bedford Village

Associates Limited Partnership, 213 F.3d 48, 52 (2d Cir. 2000)).)

"[A] plaintiff who sues solely in his capacity as an agent" is not a real and

substantial party to the controversy for diversity purposes.  Oscar Gruss, 337 F.3d at 194; see

also Airlines Reporting Corp. v. S and N Travel, Inc., 58 F.3d 857, 862 (2d Cir. 1995) ("[A

party's] corporate citizenship [is not] controlling when it acts merely as an agent representing the

interests of others.  In such a case, the citizenship of the represented individuals controls for

diversity purposes, as they are the real and substantial parties to the dispute.").  In Nesbitt, Judge

Koeltl held that the citizenship of Torchlight, the special servicer who brought the action on

behalf of U.S. Bank, should not be considered in determining diversity jurisdiction.  859 F. Supp.

---

[5] KeyBank "concurs that the Trust is the real party in interest as plaintiff in the action."  (ECF 123 at 5 n.1.)

2d at 608 n.4, 609.  Judge Koeltl explained that Torchlight's "stake in the litigation [was] entirely due to its role as the representative of the Trustee under the" relevant pooling and servicing agreement – Torchlight did not have "'its own stake in the litigation' apart from its duties under the PSA to represent Trustee, the real party in interest, in certain actions affecting the Trustee's interests."  Id. at 609 (quoting Oscar Gruss, 337 F.3d at 194)).

The same is true here, and the defendants do not argue otherwise.[6]  The Complaint seeks damages payable to the plaintiff, i.e., U.S. Bank as trustee, and not to Torchlight.  (TAC at 38-40.)  It also seeks judgment requiring the defendants to indemnify the "Plaintiff and the Trust Fund" for certain losses.  (Id. at 39.)  It alleges that "Torchlight is acting solely in its capacity as agent of the Trustee pursuant to the PSA" and does not hold legal title to the trust assets.  (TAC ¶ 20.)  In a provision nearly identical to that which informed Judge Koeltl's decision in Nesbitt, the PSA here provides that "neither the applicable Master Servicer nor the Special Servicer shall, without the Trustee's written consent . . . initiate any action, suit or proceeding solely under the Trustee's name without indicating the applicable Master Servicer's or Special Servicer's, as applicable, representative capacity . . . ."  (PSA § 3.01(b); TAC ¶ 21); see also Nesbitt, 859 F. Supp. 2d at 609.  The Court concludes that Torchlight's citizenship is not relevant to the diversity jurisdiction analysis.

3.  The Court Has Subject Matter Jurisdiction by Reason
of Diversity of Citizenship.

The Complaint alleges that U.S. Bank is a citizen and resident of Minnesota, that KeyBank is a citizen of Ohio, and that Berkadia is a citizen of New York, Delaware, and Nebraska.  (TAC ¶¶ 2-3, 5.)  Because neither of the defendants is a citizen or resident of

---

[6] KeyBank expressly agrees "that the citizenship of Torchlight is not relevant to the issue of diversity jurisdiction." (ECF 123 at 5 n.1.)  Berkadia also "concurs that this Court has subject matter jurisdiction on the basis of diversity." (ECF 115 at 8.)

Minnesota and the amount in controversy exceeds $75,000, the Court has subject matter

jurisdiction by reason of diversity of citizenship.  28 U.S.C. § 1332.

B.  Defendants' Motion to Dismiss on the Ground that
    Plaintiff's Claims Are Time Barred Will Be Granted in Part.

Defendants urge that all of plaintiff's claims are time barred.  "Generally, [t]he

lapse of a limitations period is an affirmative defense that a defendant must plead and prove.

Nevertheless, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion

if the defense appears on the face of the complaint."  Whiteside v. Hover-Davis, Inc., 995 F.3d

315, 319 (2d Cir. 2021) (citations and quotations omitted) (alteration in original) (quoting Staehr

v. Hartford Financial Services Group, Inc., 547 F.3d 406, 425 (2d Cir. 2008)).

The statute of limitations for breach of contract claims in New York is six years.

N.Y. CPLR § 213(2).  The limitations period begins to run at the time of the breach, regardless

of whether the plaintiff is aware of the breach at that time.  See Ely-Cruikshank Co. v. Bank of

Montreal, 81 N.Y.2d 399, 402-04 (1993); ABB Industrial Systems, Inc. v. Prime Technology,

Inc., 120 F.3d 351, 360 (2d Cir. 1997) ("[I]n New York it is well settled that the statute of

limitation for breach of contract begins to run from the day the contract was breached, not from

the day the breach was discovered, or should have been discovered.").

The Court will address the timeliness of each cause of action in turn.

1.  First Cause of Action Based on the Lockbox.

As noted above, the Complaint alleges that the Fordham Borrower breached the

Lockbox Agreement by diverting rents from the Lockbox to its own accounts and merely using

the Deposit Account as an account to which to remit monthly payments.  (TAC ¶ 62.)  It alleges

that, in turn, the defendants breached the PSA's Servicing Standard by failing to ensure the

18

Fordham Borrower's compliance with the Lockbox Agreement and allowing the Fordham

Borrower to proceed towards refinancing the Fordham Loan while it was in default under the

Lockbox Agreement.  (TAC ¶¶ 124-25.)

It is not clear from the Complaint when the Fordham Borrower's alleged breach

of the Lockbox Agreement first occurred.  However, plaintiff previously stated in its

memorandum of law in support of its motion for leave to amend its first amended complaint,

(ECF 68), that the alleged breach first occurred in September, or at the latest October, 2012:

> [T]he September 2012 account statement for the Deposit Account
> shows no deposits.  At the time, the rent roll for the [Fordham]
> Property was approximately $171,000 per month. . . .  Indeed, if
> there was any doubt as to whether the Fordham Borrower was
> following the terms of the Lockbox Agreement, that doubt has to be
> put to rest by the Fordham Borrower's October 10, 2012 email, in
> which Mr. Zafarani writes to his Berkadia account manager to
> complain that one of the tenants 'by error' sent its rent into the
> Deposit Account.  Rather than correcting the Fordham Borrower by
> responding that, far from being an error, this was precisely how the
> Lockbox was to be used, Berkadia instead did nothing.

(ECF 68 at 11 (citations omitted).)  Plaintiff's memorandum also expressly stated that the

defendants' "mishandling of the lockbox began more than six years prior to the commencement

of this action."  (Id. at 18.)

These statements constitute a "judicial admission" that binds plaintiff throughout

the course of this action.  See In re Motors Liquidation Co., 957 F.3d 357, 360 (2d Cir. 2020)

("A judicial admission is a statement made by a party or its counsel which has the effect of

withdrawing a fact from contention and which binds the party making it throughout the course of

the proceeding."); Purgess v. Sharrock, 33 F.3d 134, 144 (2d Cir. 1994) ("A court can

appropriately treat statements in briefs as binding judicial admissions of fact.").  To constitute a

judicial admission, the statement must (1) be one of fact, (2) "have sufficient formality or

conclusiveness," and (3) "be intentional, clear, and unambiguous."  In re Motors Liquidation, 957 F.3d at 360-61.  The above statements are factual statements regarding the timing of the alleged breaches and were made in a formal brief to the Court in support of the motion for leave to amend.  The statements clearly and unambiguously state that the breaches "began more than six years prior to the commencement of this action."  Finally, the statements were made intentionally as part of plaintiff's argument that, despite the statute of limitations, its proposed amendment would not be futile.  Plaintiff's prior statements thus conclusively establish that the alleged Lockbox-related breaches began by October 2012.

Accordingly, the defendants argue that the claim accrued in the fall of 2012 and plaintiff was required to bring suit by the fall of 2018.  As plaintiff did not commence this action until May 2020, defendants argue that this claim is time-barred.  Plaintiff responds arguing that (1) defendants should be equitably estopped from asserting the statute of limitations as an affirmative defense, and (2) the application of the continuing wrong doctrine renders the claim timely.

a. Equitable Estoppel

Contrary to plaintiff's argument, the doctrine of equitable estoppel does not prohibit defendants' statute of limitations defense.  In New York, "[t]he doctrine of equitable estoppel applies where it would be unjust to allow a defendant to assert a statute of limitations defense."  Zumpano v. Quinn, 6 N.Y.3d 666, 673 (2006); Busher v. Barry, 20-Civ-3587, 2021 WL 5071871, at *4 (2d Cir. Nov. 2, 2021) (summary order) (quoting Zumpano, 6 N.Y.3d 666). It is an "extraordinary remedy" and should only be invoked "sparingly and only under exceptional circumstances."  Twersky v. Yeshiva University, 993 F. Supp. 2d 429, 442 (S.D.N.Y.), aff'd, 579 F. App'x 7 (2d Cir. 2014) (summary order).

Equitable estoppel is appropriate when the "defendant's affirmative wrongdoing . . . produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." <u>Zumpano</u>, 6 N.Y.3d at 673 (quoting <u>General Stencils v. Chiappa</u>, 18 N.Y.2d 125, 128 (1966)); <u>Busher</u>, 2021 WL 5071871, at *4.  The doctrine applies when a plaintiff was "induced by fraud, misrepresentations or deception to refrain from filing a timely action." <u>Zumpano</u>, 6 N.Y.3d at 674 (quoting <u>Simcuski v. Saeli</u>, 44 N.Y.2d 442, 449 (1978)).  "Such fraud, misrepresentations, or deception must be affirmative and specifically directed at preventing the plaintiff from bringing suit; failure to disclose the basis for potential claims is not enough, nor are broad misstatements to the community at large." <u>Twersky</u>, 993 F. Supp. 2d at 442.  The plaintiff must also "demonstrate reasonable reliance on the defendant's misrepresentations, and due diligence in bringing a claim when the conduct relied upon as the basis for equitable estoppel ceases to be operational." <u>Id.</u> at 442-43 (citing <u>Putter v. North Shore University Hospital</u>, 7 N.Y.3d 548, 553 (2006); <u>Zumpano</u>, 6 N.Y.3d at 674, 676.

Plaintiff's equitable estoppel argument fails because it has not alleged any affirmative wrongdoing that goes beyond the defendants' alleged breaches of contract.  As plaintiff itself acknowledges, "[f]or the doctrine to apply, a plaintiff may not rely on the same act that forms the basis for the claim . . . ." <u>Ross v. Louise Wise Services, Inc.</u>, 8 N.Y.3d 478, 491 (2007) (citing <u>Zumpano</u>, 6 N.Y.3d at 675; <u>Rizk v. Cohen</u>, 73 N.Y.2d 98, 105-06 (1989)).  Plaintiff must demonstrate "egregious wrongdoing" by the defendant that "amount[s] to more than just breaches of the contract itself, or else equitable estoppel would apply to all statute of limitations defenses to breach of contract claims." <u>City of New York v. FedEx Ground Package Systems, Inc.</u>, 351 F. Supp. 3d 456, 488 (S.D.N.Y. 2018).

Plaintiff argues, in conclusory terms, that the "Defendants' affirmative wrongdoing and fraudulent concealment prevented Plaintiff from discovering Berkadia's faulty administration of the Lockbox and the Fordham Borrower's defaults under the Lockbox Agreement." (ECF 119 at 30.)   Plaintiff asserts (1) that defendants breached the PSA by failing to disclose the Fordham Borrower's defaults under the Lockbox Agreement despite having notice of the Fordham Borrower's misuse of the Lockbox, (2) that defendants "actively concealed" the Fordham Borrower's breaches and that they "never gave Plaintiff notice of the defaults, in violation of . . . the PSA," and (3) that defendants "misled Plaintiff into believing the Fordham Borrower was not in default" because they "took material affirmative acts" to close the refinancing transaction that they should have rejected.  (Id. at 30-31.)  Plaintiff references various paragraphs of the Complaint, none of which allege active concealment by defendants. (Id. at 30 (citing TAC ¶¶ 62-63, 66).)  These alleged acts and omissions are precisely the ones that plaintiff alleges constitute breaches of the PSA.  Plaintiff has alleged a breach of the PSA and nothing more.  See FedEx, 351 F. Supp. 3d at 488; see also Walker v. New York City Health & Hospitals Corp., 36 A.D.3d 509, 510 (1st Dep't 2007) ("[I]t cannot be said that defendant's conduct induced plaintiff to refrain from filing suit or conducting an investigation into the relevant facts.").[7]  Accordingly, the Court concludes that defendants are not equitably estopped from arguing the statute of limitations bars plaintiff's claims.

---

[7] Axiom Investment Advisors, LLC v. Deutsche Bank AG, 234 F. Supp. 3d 526 (S.D.N.Y. 2017), upon which plaintiff relies to argue that "[a] defendant's failure to disclose in addition to misleading communications or conduct can be sufficient to invoke equitable estoppel" is readily distinguishable.  (ECF 119 at 31 (emphasis in original).)  In Axiom, the defendant failed to disclose certain trading practices and took the additional, affirmative step of providing investors with a misleading explanation that induced Axiom to refrain from filing suit.  234 F. Supp. 3d at 539-40.  Plaintiff has not alleged a comparable affirmative step to mislead the Trustee here.

b.  <u>Continuing Wrong Doctrine</u>

Plaintiff next argues that the continuing wrong doctrine renders its Lockbox claims timely.  Under New York law, if "a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." <u>Guilbert v. Gardner</u>, 480 F.3d 140, 150 (2d Cir. 2007).  In other words, the doctrine "serves to toll the running of a period of limitations to the date of the commission of the last wrongful act." <u>Henry v. Bank of America</u>, 147 A.D.3d 599, 601 (1st Dep't 2017).  "Where applicable, the doctrine will save all claims for recovery of damages but only to the extent of wrongs committed within the applicable statute of limitations."  <u>Id.</u>; <u>Garron v. Bristol House, Inc.</u>, 162 A.D.3d 857, 859 (2d Dep't 2018) ("[W]here, as here, the sole remedy sought for the alleged continuing contractual breaches is monetary damages, the plaintiff's recovery must be limited to damages incurred within the six years prior to commencement of the action.").

However, "[t]he doctrine may only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.  The distinction is between a single wrong that has continuing effects and a series of independent, distinct wrongs."  <u>Bryant v. Broadcast Music Inc.</u>, 721 F. App'x 78, 80 (2d Cir. 2018) (summary order) (quoting <u>Henry</u>, 147 A.D.3d at 601 (quotations omitted)).  Where alleged continuing breaches constitute only "new instances of damage," the continuing wrong doctrine does not apply.  <u>Hudson Envelope Corp. v. Klausner</u>, 249 A.D.2d 31, 32 (1st Dep't 1998); <u>Miller v. Metropolitan Life Insurance Co.</u>, 979 F.3d 118, 122 (2d Cir. 2020); <u>Henry</u>, 147 A.D.3d at 601-02 ("[W]here a plaintiff asserts a single breach—with damages increasing as the breach continued—the continuing wrong theory does not apply.").

The Court concludes that the continuing wrong doctrine applies here. Berkadia had a continuing obligation under the PSA to monitor and administer the Lockbox in accordance with the Servicing Standard and to ensure that the Fordham Borrower complied with the Lockbox Agreement. (TAC ¶¶ 57, 60.) KeyBank had a continuing duty to supervise Berkadia. (TAC ¶ 159; PSA § 3.22(c).) Each occasion the Fordham Borrower allegedly failed to comply with its obligations under the Lockbox Agreement, and the defendants failed to supervise and act upon such noncompliance, would constitute a separate breach of the PSA by the defendants. In other words, the defendants' continuous failure to act upon the Fordham Borrower's violation of the Lockbox Agreement amounted to separate, actionable wrongs rather than a single breach with new instances of damage. In CWCapital Cobalt VR Ltd. v. CWCapital Investments, LLC, 195 A.D.3d 12, 19 (1st Dep't 2021), the First Department held that the continuing wrong doctrine tolled the statute of limitations because the underlying agreement conferred on the defendant a continuing duty to manage the plaintiff's investment in various trusts holding commercial mortgage-backed securities. The court explained that "while certainly a claim accrued the first time [the defendant] failed to act upon [the special servicer's] engagement in behavior that allegedly diminished the value of its investment, there is no basis for the argument that each subsequent time [the defendant] failed to act did not constitute a separate, actionable, wrong." Id.; see also Bulova Watch Co. v. Celotex Corp., 46 N.Y.2d 606, 611 (1979) (concluding, where defendant promised to repair plaintiff's roof for a period of 20 years, that a cause of action accrued, and the statute of limitations ran separately for, each time the defendant failed to repair the roof).

Berkadia cites two cases in support of its argument that the continuing wrong doctrine is "narrow" and New York courts have declined to apply it to toll claims for breaches of

pooling and service agreements.  (ECF 122 at 20-21.)  But the breaches alleged in those cases are materially distinct from the ones alleged here.  In each of those cases, the plaintiff alleged the defendants breached representations and warranties made in a mortgage loan purchase agreement.  Nomura Asset Acceptance Corp. Alternative Loan Trust v. Nomura Credit & Capital, Inc., 971 N.Y.S.2d 73, 2013 WL 2072817 (N.Y. Sup. Ct. 2013); ACE Securities Corp. v. DB Structured Products, Inc., 25 N.Y.3d 581 (2015).  However, those representations "did not arise or change over time" – they were false when made.  Nomura Asset Acceptance Corp., 2013 WL 2072817, at *8; see also ACE Securities, 25 N.Y.3d at 595.  In other words, those cases involved a single breach that occurred at a single moment of time – when the representations were made.

Therefore, the continuing wrong doctrine saves plaintiff's claims, "but only to the extent of wrongs committed within the applicable statute of limitations."  See Henry, 147 A.D.3d at 601.

c.   New York State Executive Orders

Plaintiff also argues that a series of executive orders issued by the Governor of New York during the COVID-19 pandemic tolled the statute of limitations between March 20 and November 3, 2020.  (ECF 119 at 34 n.11.)  Plaintiff contends that its Lockbox claims are therefore timely as to all breaches that occurred in the six years preceding the beginning of the toll, i.e., all breaches occurring on or after March 20, 2014.  (Id.)  KeyBank counters that the executive orders do not apply to plaintiff's claims because "Executive Order [No. 202.8] tolls the statute of limitations only with respect to actions filed in state courts in New York."  (ECF 123 at 19.)

On March 20, 2020, Governor Cuomo issued Executive Order No. 202.8, which

provided in relevant part:

> I hereby temporarily suspend or modify, for the period from the date
> of this Executive Order through April 19, 2020 the following:
>
> In accordance with the directive of the Chief Judge of the State to
> limit court operations to essential matters during the pendency of the
> COVID-19 health crisis, any specific time limit for the
> commencement, filing, or service of any legal action, notice,
> motion, or other process or proceeding, as prescribed by the
> procedural laws of the state, including but not limited to the criminal
> procedure law, the family court act, the civil practice law and rules,
> the court of claims act, the surrogate's court procedure act, and the
> uniform court acts, or by any other statute, local law, ordinance,
> order, rule, or regulation, or part thereof, is hereby tolled from the
> date of this executive order until April 19, 2020 . . . .

9 NYCRR 8.202.8.  Subsequent executive orders extended the tolling period through November

3, 2020 (together with Executive Order 202.8, the "Executive Orders").  9 NYCRR 8.202.14,

8.202.28, 8.202.38, 8.202.48, 8.202.55, 8.202.55.1, 8.202.60, 8.202.67, 8.202.72.  While

Executive Order 202.8 referenced limitations on state court operations during the pandemic, the

tolling provision was not directed specifically to New York State courts to the exclusion of other

tribunals.

In this diversity case, New York statutes of limitations govern the timeliness of

plaintiffs' state law claims, and New York law "determines the related questions of what events

serve to commence an action and to toll the statute of limitations."  See Diffley v. Allied-Signal,

Inc., 921 F.2d 421, 423 (2d Cir. 1990) (quoting Personis v. Oiler, 889 F.2d 424, 426 (2d Cir.

1989)); Vincent v. The Money Store, 915 F. Supp. 2d 553, 562 (S.D.N.Y. 2013) ("A federal

court sitting in diversity applies the forum state's statute of limitations provisions, as well as any

provisions that govern the tolling of the statute of limitations." (citing Diffley, 921 F.2d at 423)).

The Executive Orders extended the period for filing a claim, and if New York's courts would

apply them to this case, then this Court is also bound to apply them.  See Diffley, 921 F.2d at 424.

Though there is some disagreement among courts as to whether the Executive Orders "tolled" or "suspended" statutes of limitations, this Court concludes that the Executive Orders tolled the New York statute of limitations on New York state law claims asserted in a federal court.[8]  See Cain v. County of Niagara, New York, 20-Civ-1710S, 2022 WL 616795, at *5-8 (W.D.N.Y. Mar. 2, 2022) (applying Executive Order toll to plaintiff's state law claims); see also Citi Connect, LLC v. Local Union No. 3, International Brotherhood of Electrical Workers, AFL-CIO, 20-Civ-5147, 2020 WL 5940143, at *3-4 (S.D.N.Y. Oct. 7, 2020) (McMahon, J.) (noting that the Executive Orders "expressly tolled" statutes of limitations, and borrowing the toll); Bonilla v. City of New York, 20-Civ-1704, 2020 WL 6637214, at *3 (E.D.N.Y. Nov. 12, 2020) (borrowing Executive Order toll in Section 1983 action); Bowers v. City of Salamanca, 20-Civ-1206, 2021 WL 2917672, at *5-6 (W.D.N.Y. July 12, 2021) (same).

The Court concludes that the Executive Orders tolled the applicable statute of limitations from March 20, 2020, through November 3, 2020.  Plaintiff's claims based on Lockbox-related breaches that allegedly occurred between September or October 2012 and March 19, 2014, are time barred because they expired, at the latest, on March 19, 2020, before the toll was put in place.  Plaintiff's claims based on breaches that allegedly occurred on or after March 20, 2014, are timely.[9]

---

[8] Were the Court to conclude the Executive Orders instead constituted a suspension, the timeliness of plaintiff's claims would be unaffected because plaintiff commenced this action during the suspension period.  See Baker v. 40 Wall St. Holdings Corp., 161 N.Y.S.3d 723, 725 (Sup. Ct., Kings Cnty. 2022) ("With a suspension, a party can only benefit from the Executive Orders if [the] statute of limitations or filing deadline fell within the suspension period.").

[9] The Complaint alleges that the Fordham Borrower's breaches (and therefore the defendants' Lockbox-related breaches) were "ongoing" as of May 8, 2014.  (TAC ¶ 90.)

2.  <u>First Cause of Action Based on the Appraisals.</u>

Plaintiff's first cause of action is time barred to the extent it is based on the

allegedly noncompliant appraisals.

As previously noted, after the Fordham Borrower opted to repay the Fordham

Loan through a Refinancing Capital Event, the Fordham Borrower and Berkadia each procured

appraisals of the Fordham Property.  The Complaint alleges that the appraisals were "as-is"

appraisals despite the requirement in the Fordham Loan Modification Agreement that they be

"as-stabilized" appraisals.

Plaintiff alleges that the defendants breached the PSA by failing to "immediately"

reject the appraisals and instead proceeding towards closing of the Refinancing Capital Event.

(TAC ¶ 123.)  As such, the alleged breach occurred, and plaintiff's claim accrued, no later than

the date on which the defendants received the appraisals.  As alleged in the Complaint, Berkadia

received the Cushman appraisal on or about January 24, 2014.  (TAC ¶ 85.)  The Fordham

Borrower received the Leitner appraisal on or about February 13, 2014, and "thereafter"

transmitted it to Berkadia.  (TAC ¶ 86.)  Berkadia provided copies of the appraisals to KeyBank

"shortly after" receiving them.  (TAC ¶ 94.)  Plaintiff's claim therefore accrued in or about

February 2014, and the six-year limitations period expired in or about February 2020, months

before plaintiff commenced this action and before the beginning of the toll put in place by the

Executive Orders.  Therefore, the first cause of action is time barred to the extent it is premised

on the appraisals.

Plaintiff's argument that its first claim based on the appraisals is timely because it

"sounds in indemnification" is untenable.[10]  (ECF 119 at 28.)  "An indemnity claim seeks

_____

[10] Plaintiff does not raise an equitable estoppel argument or the continuing wrong doctrine with respect to the appraisals.  (<u>See</u> ECF 119 at 29, 33.)

reimbursement for payment made to a third party . . . ."  Peoples' Democratic Republic of

Yemen v. Goodpasture, Inc., 782 F.2d 346, 350 (2d Cir. 1986).  Under New York law, an

indemnity claim accrues on the date that the party seeking indemnity suffers a loss, i.e., makes a

payment.  Id.; Sompo Japan Insurance Co. of America v. Norfolk Southern Railway Co., 762

F.3d 165, 188 (2d Cir. 2014).

        Plaintiff asserts that its first cause of action "seeks to make Plaintiff whole for

losses caused to Plaintiff by the claims of a third party (i.e., Fordham Borrower)."[11]  (ECF 119 at

28.)  Because plaintiff did not begin to incur losses until the Fordham State Court Action was

commenced in June 2014 and "the full extent of the losses . . . are continuing and cannot yet be

fully determined," plaintiff argues that "the statute of limitations has not even begun to run."

(Id.)  But the first cause of action is plainly a breach of contract claim.  It alleges that the

defendants breached the Servicing Standard, specifically, "sections 1.01, 3.01(b) & 3.22(a)(i) &

(vii)" of the PSA.  (TAC ¶ 125.)  It expressly seeks "compensatory damages" resulting from the

defendants' breaches, including categories of damages that do not seek "reimbursement" for

payments made to the Fordham Borrower or any other third party (e.g., "The loss of millions of

dollars of cash collateral securing the Fordham Loan;" "The loss of millions of dollars of interest

that should have been paid with respect to the Fordham Loan").  (See TAC ¶¶ 127-28); see also

Goodpasture, 782 F.2d at 350.  The fact that plaintiff has attempted in its opposition brief to

recast this claim as one for indemnification does not make it so.  See Goodpasture, 782 F.2d at

350 (quoting Bunker v. Bunker, 80 A.D.2d 817, 817 (1st Dep't 1981)).  The first cause of action

based on the appraisals is time barred.

---

[11] The sixth and seventh causes of action are claims for indemnity and "disgorgement," respectively.  The timeliness
of those claims will be addressed below.

3.   <u>Second and Third Causes of Action Based on the Lockbox.</u>

The second and third causes of action allege that the defendants breached the PSA because their failure to enforce the Lockbox Agreement effectively modified or waived the terms of the Lockbox Agreement and released a valuable security interest securing the repayment of the Fordham Loan.  (TAC ¶¶ 132-33, 138, 147.)

In contrast to the first cause of action, the continuing wrong doctrine does not apply to these claims.  Any alleged waiver or modification of the Fordham Loan Modification Agreement or the Lockbox Agreement would have occurred at the moment of the defendants' first Lockbox-related breach in the fall of 2012.  In other words, the alleged waiver or modification (and the corresponding breach of the PSA) was a one-time event rather than a repeatedly occurring wrong.

The second and third causes of action based on the Lockbox are therefore time barred because they accrued in the fall of 2012 and the six-year limitations period expired in the fall of 2018, before plaintiff commenced this action and before the beginning of the toll put in place by the Executive Orders.

4.   <u>Second and Third Causes of Action Based on the Appraisals.</u>

The Complaint does not expressly allege that the defendants' conduct with respect to the appraisals constituted a waiver or modification of the terms of the Fordham Loan Modification Agreement.  (<u>See</u> TAC ¶¶ 130-131, 143-44.)  The Complaint merely states that "Plaintiff has disputed the allegations of Fordham Borrower in the Fordham [State Court] Action that the requirements of the Fordham Loan Modification Agreement were either waived or modified so as to permit 'as-is' appraisals," but that "[i]f the State Court nonetheless determines that the requirements of the Fordham Loan Modification Agreement were either waived or

modified so as to permit 'as-is' appraisals . . . then such determination <u>would</u> establish that the requirements of the Fordham Loan Modification Agreement were either waived or modified by the acts and omissions of Defendants KeyBank and Berkadia."  (TAC ¶¶ 130-31, 143-44 (emphasis added).)

Assuming the second and third causes of action allege that the defendants violated the PSA because their failure to "immediately" reject the appraisals waived or modified the terms of the Fordham Loan Modification Agreement, those claims are time barred for the reasons already stated.  Specifically, the alleged waiver or modification would have been a one-time event that occurred on the date the defendants received the appraisals.

5.   <u>Fourth Cause of Action.</u>

The fourth cause of action, brought against KeyBank only, alleges that KeyBank is contractually liable for Berkadia's breaches.  (TAC ¶¶ 152-53.)  For the reasons already stated, this claim is time barred as it relates to (1) the appraisals, and (2) the Lockbox-related breaches that allegedly occurred prior to March 20, 2014.  This claim is timely insofar as it is based on Lockbox-related breaches that allegedly occurred on or after March 20, 2014.

6.   <u>Fifth Cause of Action.</u>

The fifth cause of action, brought against KeyBank only, alleges that KeyBank breached its own contractual obligation to monitor the performance and enforce the obligations of Berkadia, as KeyBank's Sub-Servicer.  (TAC ¶ 160.)  For the reasons already stated, this claim is time barred as it relates to (1) the appraisals, and (2) the Lockbox-related breaches that allegedly occurred prior to March 20, 2014.  This claim is timely insofar as it alleges KeyBank failed to monitor the performance and enforce the obligations of Berkadia with respect to the Lockbox on or after March 20, 2014.

7.   <u>Sixth and Seventh Causes of Action.</u>

The final two causes of action are labeled as claims for "indemnification" and "disgorgement" in the Complaint.  The defendants argue these claims are merely breach of contract claims disguised as indemnification claims.  Importantly, although breach of contract claims and indemnification claims are both subject to the same six-year statute of limitations, the time of accrual determines whether they are timely.

As previously explained, an indemnity claim "seeks reimbursement for payment made to a third party" and accrues when the party seeking indemnity suffers a loss, i.e., makes a payment.  <u>Goodpasture</u>, 782 F.2d at 350; <u>Sompo Japan Insurance Co. of America</u>, 762 F.3d at 188.  The sixth cause of action alleges that the defendants are required under the PSA to "indemnify Plaintiff and the Trust Fund, among others, and to hold them harmless from any and all claims, losses, penalties, fines, forfeitures, reasonable legal fees and related out-of-pocket costs, liabilities, fees and expenses that any of them may sustain arising from, among other things, (a) any willful misfeasance, bad faith or negligence of [the defendants] in the performance of [their] obligations and duties under the PSA or (b) any negligent disregard by [the defendants] of [their] obligations and duties under the PSA."  (TAC ¶¶ 165-66.)  It further alleges that "[t]he acts and omissions of Defendant KeyBank and Berkadia complained of herein individually and in the aggregate constitute willful misfeasance, bad faith or negligence in the performance of their obligations and duties" and constitute negligent disregard of their obligations and duties.  (TAC ¶¶ 167-68.)

Read in the context of the entire Complaint, the sixth cause of action appears to seek indemnification for claims, penalties, legal fees, and other costs that plaintiff has already sustained or "may sustain" in connection with the Fordham State Court Action, and which it

owes, has paid, or will owe or pay to a third party, such as the Fordham Borrower or the

attorneys retained by U.S. Bank to defend the action.  Thus, plaintiff's sixth cause of action is a

true claim for indemnification and accrued or will accrue on the date of payment to a third party.

The claim is therefore timely, as all payments made in connection with the Fordham State Court

Action, which was commenced in June 2014, would have occurred after March 20, 2014.

    The seventh cause of action alleges that the Trust Fund has already indemnified

KeyBank and Berkadia for legal fees and other expenses that they incurred in connection with

the Fordham State Court Action.  (TAC ¶ 172.)  It further alleges that the defendants were not

entitled to such indemnification because their expenses were incurred by reason of (a) bad faith,

willful misconduct or negligent performance of their duties under the PSA or (b) negligent

disregard of their duties under the PSA, and that they are required to disgorge and repay to

plaintiff all such amounts.  (TAC ¶¶ 173-75.)

    This claim seeks "disgorgement" of the funds paid to the defendants, but this is

simply the particular remedy sought for an alleged breach of contract.  See Access Point

Medical, LLC v. Mandell, 106 A.D.3d 40, 43-44 (1st Dep't 2013) (explaining that claims for the

equitable remedy of disgorgement typically seek an order directing a party to disgorge its "ill-

gotten gains" or wrongfully obtained funds to recompense injured third parties).  In essence,

plaintiff seeks reimbursement of funds that it paid to the defendants and to which the defendants

were not entitled as a result of their breaches of the PSA.  See id. ("[P]laintiffs' demand for the

return of attorneys' fees they paid to defendants is, essentially, a claim for monetary damages.

The calculated use of the term 'disgorgement' instead of other equally applicable terms such as

repayment, recoupment, refund, or reimbursement, should not be permitted to distort the nature

of the claim so as to expand the applicable limitations period . . . ."); see also Ritchie Special

Credit Investments, Ltd. v. JPMorgan Chase & Co., 14-Civ-4786, 2021 WL 2686079, at *7 n.9 (D. Minn. June 30, 2021) (concluding that plaintiff's request for "disgorgement" was a demand for money damages because plaintiff sought "repayment of its own money," and applying New York's statute of limitations for unjust enrichment claims seeking monetary damages), aff'd, 48 F.4th 896 (8th Cir. 2022).

As a claim for breach of contract, plaintiff's seventh cause of action accrued at the time of breach and is timely to the same extent as the first cause of action. See Ely-Cruikshank, 81 N.Y.2d at 402-04; ABB Industrial Systems, 120 F.3d at 360. Both the Lockbox allegations and the appraisal allegations are potentially relevant to this claim. The Fordham Borrower initiated the Fordham State Court Action after the Refinancing Capital Event failed to close in June 2014. The Refinancing Capital Event failed to close because Berkadia informed the Fordham Borrower in late May 2014 that the appraisals did not comply with the Fordham Loan Modification Agreement. The Complaint also alleges that the Refinancing Capital Event that led to the Fordham State Court Action was impermissible from the outset due to the Fordham Borrower's alleged default under the Lockbox Agreement. Accordingly, like the first cause of action, this claim is time barred as it relates to (1) the appraisals, and (2) the Lockbox-related breaches that allegedly occurred prior to March 20, 2014. It is timely to the extent it relates to Lockbox-related breaches that allegedly occurred on or after March 20, 2014.

In sum, the following claims are barred by the statute of limitations and are dismissed: (1) the first, fourth, fifth, and seventh causes of action to the extent they relate to the appraisals or to Lockbox-related breaches that allegedly occurred prior to March 20, 2014, (2) the second cause of action, and (3) the third cause of action.

The following claims are timely: (1) the first, fourth, fifth, and seventh causes of action to the extent they relate to Lockbox-related breaches that allegedly occurred on or after March 20, 2014, and (2) the sixth cause of action.

C.   Torchlight's Authority to Bring this Action on the Trustee's Behalf.

KeyBank and Berkadia each argue that the PSA does not empower Torchlight to bring this action.  In essence, they urge that this action should be dismissed in its entirety because Torchlight lacks contractual standing.[12]  For the reasons that will be explained, the Court concludes that Torchlight has contractual standing to bring this action on the Trustee's behalf.

Defendants' contractual standing point challenges "whether a party has the right to enforce a contract."  See SM Kids, LLC v. Google LLC, 963 F.3d 206, 211 (2d Cir. 2020). "Contractual standing is a prudential limitation on the Court, rather than a constitutional one."[13] Tang Capital Partners, LP. v. BRC Inc., 22-Civ-3476, 2023 WL 2396635, at *16 (S.D.N.Y. Mar. 8, 2023).  A plaintiff has contractual standing if it "is in privity of contract with the defendant or is a third-party beneficiary of the contract."  Id. at *16 (denying motion to dismiss for failure to plead contractual standing) (quoting Hillside Metro Associates, LLC v. JPMorgan Chase Bank, National Association, 747 F.3d 44, 49 (2d Cir. 2014)).

The issue of contractual standing is appropriately decided on a motion to dismiss. Buffalo Xerographix, Inc. v. Hartford Insurance Group, 20-Civ-520, 2021 WL 2003110 (W.D.N.Y. May 19, 2021) ("Rule 12(b)(6) . . . applies to motions to dismiss for lack of

---

[12] KeyBank argues that Torchlight does not have the "authority" to file this action, and Berkadia argues that Torchlight lacks "contractual standing."  Because both defendants dispute Torchlight's ability to bring this action by reference to the terms of the PSA, the Court construes both arguments as asserting lack of contractual standing.
[13] As the Second Circuit has explained, contractual standing is distinct from Article III standing.  Article III standing "speaks to the power of a court to adjudicate a controversy," while contractual standing is a question of "a party's right to relief for breach of contract."  SM Kids, 963 F.3d at 211.  Contractual standing goes to the merits and does not implicate subject-matter jurisdiction.  Id. at 211-12.

contractual standing." (citing <u>SM Kids</u>, 963 F.3d at 212)), <u>aff'd sub nom.</u> <u>Buffalo Xerographix,</u>

<u>Inc. v. Sentinel Insurance Co., Ltd.</u>, 21-1502, 2022 WL 4241191 (2d Cir. Sept. 15, 2022)

(summary order).

Defendants argue that the PSA limits Torchlight's authority to sue to specific

contexts, which do not include bringing a breach of contract action against another party to the

PSA.  They further assert that, under the PSA, only the Trustee, or in certain circumstances the

Certificateholders, can bring such an action.  Plaintiff counters that the broad language of

sections 3.01(b) and 6.03(b) of the PSA entitle it to bring this action.

Section 3.01(b) of the PSA grants the Special Servicer, i.e., Torchlight, broad

authority to act in ways that it "may deem necessary or desirable" in connection with its

servicing and administration of the mortgage loans:

> The Special Servicer and any Master Servicer shall service and administer the Mortgage Loans . . . that it is obligated to service and administer pursuant to this Agreement, for the benefit of the Certificateholders (as a collective whole), in accordance with: (i) any and all applicable laws; (ii) the express terms of this Agreement and the respective Mortgage Loan Documents . . . and (iii) the REMIC Provisions and, to the extent consistent with the foregoing, the Servicing Standard.  Subject to the foregoing, the Master Servicer and <u>Special Servicer shall each have full power and authority</u>, acting alone or through Sub-Servicers, <u>to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable</u>.

(PSA § 3.01(b) (emphasis added).)  It further provides that the Special Servicer need only obtain

the Trustee's written consent before acting in two circumstances, one of which is the manner of

instituting a suit in the Trustee's name:

> [N]otwithstanding anything contained herein to the contrary, neither the applicable Master Servicer nor the Special Servicer shall, without the Trustee's written consent: (i) initiate any action, suit or proceeding solely under the Trustee's name without indicating the applicable Master Servicer's or Special Servicer's, as applicable,

representative capacity; or (ii) take any action with the intent to cause, and that actually causes, the Trustee to be registered to do business in any state.

(Id.)  Subsumed within Torchlight's "necessary or desirable" power is the power to institute suit. Consistent with (i) above, Torchlight has initiated an action in the Trustee's name, and it has expressly indicated that it is suing in its representative capacity.[14]  Thus, Torchlight is in literal compliance with section 3.01(b).

The Court is not persuaded by defendants' argument that the phrase "in connection with such servicing and administration" means that Torchlight may only commence actions to administer and enforce mortgage loans and may not bring an action asserting a breach of the PSA on the Trustee's behalf.  (ECF 122 at 9; ECF 123 at 11-12.)  Nothing in section 3.01(b) suggests that the Special Servicer is not entitled to enforce the PSA on behalf of the Trustee.  See Nomura Asset Acceptance Corp. Alternative Loan Trust Series 2006-S4 v. Nomura Credit & Capital, Inc., 653390/2012, 2018 WL 2197830, at *13-14 (N.Y. Sup. Ct. May 14, 2018) (concluding that a seller of securitized loans had contractual standing, as a party to the relevant pooling and servicing agreement, to sue a servicer for breach of its servicing obligations because a provision substantially similar to section 3.01(b) of the PSA at issue here did "not identify, and thus limit, the contracting parties entitled to enforce [the servicer's] servicing obligations . . .").[15]

---

[14] There is no claim that (ii) is implicated in this action.
[15] The provision at issue in Nomura stated:

Each Servicer shall service and administer the related Mortgage Loans . . . on behalf of the Trust and in the best interest of and for the benefit of the Certificateholders (as determined by such Servicer in its reasonable judgment) in accordance with the terms of this Agreement and the Mortgage Loans and to the extent consistent with such terms and in accordance with and exercising the same care in performing those practices that each Servicer customarily employs and exercises in servicing and administering mortgage loans for its own account (including, compliance with all applicable federal, state and local laws). . . .

Torchlight's authority to bring this action on the Trustee's behalf also derives from the similarly broad language in section 6.03(b).  Section 6.03(b) provides that "the Depositor, each Master Servicer, the Special Servicer or the Trustee may in its discretion undertake any such action . . . that it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto and the interests of the Certificateholders hereunder."  (PSA § 6.03(b).)

Defendants urge that section 6.03(b) only entitles the Special Servicer to undertake actions "in respect to" its "rights and duties" under the PSA, which does not encompass the power to sue for a breach of the PSA.  (ECF 110 at 23-24; ECF 115 at 26.) KeyBank asserts that allowing Torchlight to bring suit against its fellow servicers is inconsistent with other provisions of the PSA and permits Torchlight "to usurp rights that clearly belong to other PSA parties, under other provisions of the PSA."  (ECF 110 at 24-25.)  But no provision of the PSA – including the ones proffered by KeyBank – confines this type of action to any other party.

Finally, defendants assert that Torchlight lacks the authority to bring this action because the PSA sets forth a particular procedure for suing for breaches of the PSA, which does not involve the Special Servicer.  According to KeyBank, there are only two potential consequences of a servicer's "Event of Default" and neither contemplate the involvement of the Special Servicer: (1) under section 7.01(b), the Trustee and Certificateholders may terminate the

---

Subject only to the above-described applicable servicing standards (the "Accepted Servicing Practices") and the terms of this Agreement and of the respective Mortgage Loans, <u>each Servicer shall have full power and authority</u> . . . <u>to do or cause to be done any and all things that it may deem necessary or desirable in connection with such servicing and administration</u> . . . .

<u>Nomura</u>, 2018 WL 2197830, at \*2, \*2 n.4 (emphasis added).  The <u>Nomura</u> court's interpretation of this nearly identical provision is helpful guidance here.  The Court has considered and rejected the defendants' efforts to distinguish the case.  (<u>See</u> ECF 122 at 9; ECF 123 at 14.)

defaulting party, or (2) under section 11.03(c), a Certificateholder may institute any suit "upon or under or with respect to" the PSA so long as the holders of certificates entitled to at least 25% of the voting rights make a written request to the Trustee to bring the action in the Trustee's name, offer the Trustee reasonable indemnity, and the Trustee, for 60 days after receiving the request and offer of indemnity, neglects or refuses to institute the action.  (ECF 110 at 20-22.)

But section 11.03(c) is a limitation on the rights of the Certificateholders, not the Special Servicer.  It does not restrict the broad language of sections 3.01(b) and 6.03(b) giving the Special Servicer the right to do anything in connection with its servicing and administration of the mortgage loans that it deems necessary and desirable, (PSA § 3.01(b)), and the right to undertake any action it deems necessary and desirable in respect to the PSA and its rights and duties thereunder, (PSA § 6.03(b)).

The PSA also does not, as Berkadia suggests, indicate that the "Controlling Class Representative" has complete control over the Special Servicer such that the Special Servicer must comply with section 11.03(c)'s limitations on suits brought by Certificateholders.  (See ECF 115 at 27-28.)  Berkadia states that the "Special Servicer is accountable to the Certificateholders to ensure that the trust does not realize losses on defaulted loans.  For this reason, the PSA grants the Controlling Class, via its representative, control over the Special Servicer."  (Id. at 27.)  Section 3.24(a) of the PSA expressly enumerates the actions for which the Special Servicer must obtain the consent of the Controlling Class Representative – and commencing a lawsuit under the PSA is not one of them.  (See PSA § 3.24(a)(i)-(x).)  However, the Special Servicer may take any of the enumerated actions without waiting for the response of the Controlling Class Representative if the Special Servicer determines that immediate action is necessary to protect the interests of the Certificateholders as a whole.  (PSA § 3.24(a).)  And

section 3.24(b) provides that the Controlling Class Representative may not give any advice or direction that causes the Special Servicer to violate applicable law, the PSA, or any loan terms. These provisions do not support Berkadia's view that the Special Servicer must abide by the notice requirements in section 11.03(c) prior to bringing suit on behalf of the Trustee.

The Trustee by and through Torchlight as Special Servicer has the authority to assert claims under the PSA against KeyBank and Berkadia.

D.  The PSA Did Not Require Torchlight to Declare an
    <u>"Event of Default" Prior to Initiating this Action.</u>

KeyBank moves to dismiss the action in its entirety on the ground that the Complaint fails to allege that an "Event of Default" has occurred or been declared under the PSA.  (ECF 110 at 17.)

Article VII of the PSA sets forth the definition and consequences of an "Event of Default."  Section 7.01 of the PSA defines an "Event of Default," as applicable here, as:

> [A]ny failure on the part of the applicable Master Servicer . . . duly to observe or perform in any material respect any other of the covenants or agreements on the part of such Master Servicer . . . contained in this Agreement, which failure continues unremedied for a period of 30 days . . . after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to such Master Servicer . . . by any other party hereto . . . .

(PSA § 7.01(a)(iii).)

If an Event of Default is continuing and remains unremedied, "the Trustee may, and at the written direction of the Holders of Certificates entitled to not less than 25% of the Voting Rights, the Trustee shall" terminate the defaulting party.  (PSA § 7.01(b).)  Additionally, section 7.03(b) provides for the following actions to be taken after an Event of Default occurs:

> Not later than the later of (i) 60 days after the occurrence of any event which constitutes, or, with notice or lapse of time or both, would constitute, an Event of Default and (ii) five days after a Responsible Officer of the Trustee has actual knowledge of the occurrence of such an event, the Trustee shall submit by mail to the Depositor, to the Swap Counterparty and to all Certificateholders notice of such occurrence . . . unless such default shall have been cured.

(PSA § 7.03(b).)

Under section 7.04, the Certificateholders have the option to waive an Event of

Default:

> The Holders of Certificates representing at least 66-2/3% of the Voting Rights allocated to each Class of Certificates affected by any Event of Default hereunder may waive such Event of Default . . . . Upon any such waiver of an Event of Default, and payment to the Trustee of all costs and expenses incurred by the Trustee in connection with such default prior to its waiver (which costs shall be paid by the party requesting such waiver), such Event of Default shall cease to exist and shall be deemed to have been remedied for every purpose hereunder. . . .

(PSA § 7.04.)

The Complaint does not allege that any written notice was ever provided to

KeyBank or Berkadia or that they were given 30 days to cure the alleged failures.  (See PSA §

7.01.)  Defendants therefore urge that it does not allege the occurrence of an Event of Default

under the PSA.  Defendants also point out that the Complaint also does not allege that the

Trustee provided notice of an Event of Default to the Certificateholders, who would have been

given the option to waive the Event of Default.  (See PSA §§ 7.03(b), 7.04.)

Plaintiff does not factually dispute these points, but urges that it was not obligated

to issue a notice of default before commencing this action.  As already explained, Torchlight

brings this action pursuant to its authority under sections 3.01(b) and 6.03(b) – not pursuant to

41

section 7.01.[16]  The term "Event of Default" does not appear in section 3.01 or 6.03, nor do those sections require the Special Servicer to provide any notice to any party before bringing an action it deems "necessary or desirable."

KeyBank argues that even if section 3.01(b) governs this action, plaintiff must still comply with section 7.01(a) because Torchlight's right under section 3.01(b) to "do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable" is "subject to" its obligation to administer and service the loans "in accordance with . . . the express terms of this Agreement," including section 7.01(a).  (ECF 123 at 7.)  Similarly, any action brought pursuant to section 6.03(b) must still be "in respect to" the PSA, the duties of the parties thereto, and the interests of the Certificateholders, which means the action must comply with section 7.01(a) and the duty it imposes to provide notice, an opportunity to cure, and an opportunity for waiver by the Certificateholders Default.  (Id. at 7-8.)

Again, KeyBank takes an unjustifiably restrictive view of sections 3.01(b) and 6.03(b).  Those provisions do not limit Torchlight's authority to sue based on an "Event of Default."  The requirements in Article VII to provide notice of, an opportunity to cure, and an opportunity to waive an Event of Default do not apply to suits brought by the Special Servicer pursuant to section 3.01(b) or 6.03(b).

KeyBank's reliance upon Alden Global Value Recovery Master Fund, L.P. v. KeyBank National Association, 650928/2016, 2016 WL 6963190 (N.Y. Sup. Ct. N.Y. Cnty. Nov. 28, 2016), aff'd, 159 A.D. 618 (1st Dep't 2018); (ECF 123 at 8-10), is misplaced.  Alden

---

[16] KeyBank's argument that the plaintiff's position "defies common sense" because section 7.04 gives the Certificateholders the right to waive an alleged Event of Default "for every purpose hereunder" including for the purpose of asserting a breach claim, and not just for the purpose of the termination remedy, misses the mark because plaintiff does not assert that the breaches of the PSA alleged in the Complaint constitute an Event of Default.  (See ECF 123 at 6.)  The allegations are outside the universe of Article VII.

was confined to a suit by a certificateholder brought pursuant to a provision substantially similar to section 11.03(c) of the PSA that required written notice of default.  159 A.D. at 619; (PSA § 11.03(c)).  But plaintiff here is not a Certificateholder and is not governed by section 11.03(c) or its reference to "default . . . as hereinbefore provided."  The PSA provisions relevant here – sections 3.01(b) and 6.03(b) – do not require plaintiff as Special Servicer to provide notice and declare an "Event of Default" before bringing suit.

The Court concludes that the PSA did not require Torchlight to declare an "Event of Default" before initiating this action.

### E.  Limitation of Liability Clause.

Berkadia argues that the PSA's limitation of liability clause bars the plaintiff's claims.  (ECF 115 at 29.)  Under section 6.03(a), the parties to the PSA are not liable "for any action taken or for refraining from the taking of any action in good faith pursuant to [the PSA], or for errors in judgment."  (PSA § 6.03(a).)  But this provision does not protect the parties to the PSA against "any liability which would otherwise be imposed on such party by reason of willful misfeasance, bad faith or negligence in the performance of its duties or by reason of negligent disregard of its obligations and duties hereunder."  (Id.)

Berkadia urges that, given section 6.03(a), defendants may not be sued for breach of contract.  Rather, plaintiff must bring a negligence claim and must allege an "independent, noncontractual duty of care" owed to the Trust.  (ECF 115 at 30.)

The Court disagrees.  Section 6.03(a) does not provide that a party to the PSA may be held liable only for tort actions alleging negligence and not for contract actions alleging negligent performance or negligent disregard of contractual obligations.  Plaintiff would be

43

required to establish a breach of an "independent, noncontractual duty of care" if it had brought a tort claim for negligence but it does not.  See Life Insurance Fund Elite LLC v. Hamburg Commercial Bank AG, 545 F. Supp. 3d 86, 92 (S.D.N.Y. 2021) ("It is a well-established principle that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated." (quoting Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987))).  The Complaint seeks to hold the defendants liable pursuant to the PSA for conduct that plaintiff alleges constituted willful misfeasance, bad faith, and negligent performance or negligent disregard for their contractual obligations.  (TAC ¶¶ 167-68, 174; see also id. ¶ 84 (alleging that the noncompliant nature of the appraisals "was obvious and indisputable to any person exercising the care mandated by the Servicing Standard"); id. ¶ 102 ("[A]ny person exercising the bare minimum of care . . . would have immediately realized that neither of the Appraisals satisfied [the Fordham Loan Modification Agreement].").)  The claims are within the scope of section 6.03(a) and Berkadia's motion to dismiss on this ground is denied.

F. Failure to State a Claim Under Rule 12(b)(6)

1. Legal Standard

Rule 12(b)(6), Fed. R. Civ. P., requires a complaint to "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has

acted unlawfully." Id.  A sufficient complaint must include non-conclusory factual allegations that move its claims "across the line from conceivable to plausible."  Id. at 678-80.

In assessing the sufficiency of a pleading, a court must disregard legal conclusions, which are not entitled to the presumption of truth.  Id. at 678.  Instead, the Court must examine the well-pleaded factual allegations and "determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal is appropriate when 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE, 763 F.3d 198, 208-09 (2d Cir. 2014) (per curiam) (quoting Conopco, Inc. v. Roll International, 231 F.3d 82, 86 (2d Cir. 2000)).

"A motion brought under Rule 12(b)(6) challenges only the 'legal feasibility' of a complaint.  The test of a claim's 'substantive merits' is 'reserved for the summary judgment procedure, governed by [Rule] 56, where both parties may conduct appropriate discovery and submit the additional supporting material contemplated by that rule.'"  Goel, 820 F.3d at 558-59 (quoting Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 155 (2d Cir. 2006)).

A court reviewing a motion to dismiss "take[s] no account of [the complaint's] basis in evidence" and "may review only a narrow universe of materials."  Id. at 559.  Such materials include documents incorporated in the complaint, matters of which judicial notice may be taken, and documents that are "integral" to the complaint, even if they are not expressly incorporated.  Id.; see also Chambers, 282 F.3d at 153 (stating that a document is "integral" to a complaint where the complaint "relies heavily upon its terms and effect").

2.   The Lockbox Claims Plausibly Allege the
     Defendants Breached the PSA.

Plaintiff's Lockbox claims allege that (1) the Lockbox Agreement required the

Fordham Borrower to instruct its tenants to pay monthly rents directly into the Deposit Account;

(2) that "the Fordham Borrower diverted rents from the Lockbox to its own accounts and used

the Deposit Account . . . as nothing more than an account to remit monthly payments to;" (3) that

the Fordham Borrower was therefore in breach of the Lockbox Agreement; and (4) that the

defendants breached the PSA's Servicing Standard by failing to monitor the Fordham

Borrower's compliance with the Lockbox Agreement and by allowing the Fordham Borrower to

proceed towards closing of the Refinancing Capital Event despite its default.  (TAC ¶¶ 56, 60-

63, 124-25.)

Defendants argue that, as a matter of law, these allegations do not give rise to a

breach of contract claim.  They assert that they could not have breached the PSA because the

Fordham Borrower complied with its obligations; more specifically, the Fordham Borrower was

permitted to accept payments from tenants and then deposit the funds into the Lockbox itself one

day later.  The Court agrees with defendants except in one important instance: the plausible

allegation that the Fordham Borrower "diverted rents" into its own accounts.

The Lockbox Agreement required the Fordham Borrower to direct each

commercial tenant, by written notice, to remit all rent payments to the Lockbox (the "Tenant

Direction Letters").  (Lockbox Agreement § 4.02(a).)  Upon request by the Lender, the Fordham

Borrower was required to certify in writing that it sent such Tenant Direction Letters and to

provide itemized statements documenting the rents deposited in the Lockbox Account.  (Id. §

4.02(b), (c).)  If the Fordham Borrower failed to provide the Tenant Direction Letters, or if there

was any other continuing Event of Default, the Lender was entitled to direct the tenants to remit all rents directly into the Lockbox.  (Id. § 4.02(a).)

Additionally, section 4.01 of the Lockbox Agreement provided that the Fordham Borrower shall "cause all Rents to be paid and deposited directly into the Deposit Account by directing commercial tenants, if any, to make payments of Rents to the Lockbox in accordance with Section 4.02."  (Id. § 4.01.)  However, if the Fordham Borrower "receives any payments directly from its tenants," the Fordham Borrower must "deposit such sums in the [Lockbox Account] within one Business Day of [its] receipt thereof."  (Id.)

A claim that defendants' acts and omissions constitute a breach of the PSA may only be premised upon the Fordham Borrower's breach of its obligations.  The Court, upon review of the Complaint, concludes that one specific type of breach by the Fordham Borrower is plausibly alleged: the diversion of rents into its own accounts.  Plaintiff alleges in paragraph 62 as follows: "Taking advantage of Defendants' laxity, the Fordham Borrower diverted rents from the Lockbox to its own accounts and used the Deposit Account (when it was even being used) as nothing more than an account to remit monthly payments to."  (TAC ¶ 62.)  Berkadia asserts that the allegation is made "falsely" and is implausibly under Iqbal.  It points out that plaintiff, possessed of documentation, would have made a more specific allegation if there were any truth to the claim.  While defendants may ultimately prove correct, the Court concludes that there is enough heft to the claim to get over the plausibility hurdle.  In the context of the entire Complaint, it is a reasonably clear allegation that tenant rents that came into the Fordham Borrower's possession in some instances were not deposited in the Lockbox but were instead deposited in the Fordham Borrower's account.  This allegation, coupled with the allegation in paragraph 63, that defendants knew of the Fordham Borrower's breaches of the Lockbox

Agreement but did not take the required steps under the PSA, (TAC ¶ 63), is sufficient to state a

claim under the PSA.  For the same reasons, plaintiff's sixth cause of action plausibly alleges a

claim for indemnification based on the defendants' alleged Lockbox-related breaches.

Additionally, defendants assert that the Complaint fails to allege that the Trust

suffered any injury as a result of the alleged breaches.  "To state a claim for breach of contract

under New York law, 'the complaint must allege . . . damages.'"  Orlander v. Staples, Inc., 802

F.3d 289, 294 (2d Cir. 2015) (quoting Johnson v. Nextel Communications, Inc., 660 F.3d 131,

142 (2d Cir. 2011)); Gordon v. Dino De Laurentiis Corp., 141 A.D.2d 435, 436 (1st Dep't 1988).

The Complaint alleges that plaintiff suffered several types of damages as a result of defendants'

breaches.  (See, e.g., TAC ¶ 127.)  For example, plaintiff allegedly incurred substantial costs in

connection with the Fordham State Court Action, which only ensued because defendants failed

to inform the Fordham Borrower it was not entitled to refinance the loan, in breach of their

obligations under the PSA.  (TAC ¶¶ 66, 126, 127(a), (b).)  The Complaint also plausibly, though

implicitly, alleges that defendants' actions and inactions resulted in the state court injunction

that, in turn, assisted in enabling the Fordham Borrower to dissipate millions of dollars of cash

collateral securing Fordham Loan.  (TAC ¶¶ 115-17, 127(c)-(e).)  These allegations suffice at

this stage of the proceeding.  The parties will be free to address the issue at the summary

judgment stage.

The Court has already dismissed as time barred (1) the first, fourth, fifth, and

seventh causes of action insofar as they are based on Lockbox-related breaches that allegedly

occurred before March 20, 2014, and (2) the second and third causes of action in their entirety.

The defendants' motions to dismiss are denied with respect to the sixth cause of action and the

remaining, timely portions of plaintiff's first, fourth, fifth, and seventh causes of action to the

extent they allege defendants failed to monitor and take appropriate action with respect to the Fordham Borrower's purported diversion of rents from the Lockbox to its own accounts.

G.  Issue Preclusion.

Plaintiff's only remaining claim is its sixth cause of action seeking indemnification of costs incurred as a result of the defendants' alleged conduct related to the appraisals.  This claim must be dismissed because it is barred by collateral estoppel, or "issue preclusion."[17]

KeyBank asserts that plaintiff's appraisal allegations are a collateral attack on two New York state court orders arising out of the Fordham State Court Action that decided the appraisals properly contained "as-stabilized" valuations rather than "as-is" valuations.[18]  The Court agrees that plaintiff is attempting to relitigate the previously decided issue of whether the appraisals complied with the Fordham Loan Modification Agreement.

"Dismissal under Rule 12(b)(6) is appropriate when a defendant raises collateral estoppel, or issue preclusion, as an affirmative defense and it is clear from the face of the complaint, and consideration of matters which the court may take judicial notice of, that the plaintiff's claims are barred as a matter of law."  Wachtmeister v. Swiesz, 59 F. App'x 428, 429 (2d Cir. 2003) (summary order) (citing Conopco, 231 F.3d at 86-87); TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 498 (2d Cir. 2014).  The Court takes judicial notice of the state

---

[17] KeyBank argues that plaintiff's appraisal-related claims are barred by both issue preclusion (i.e., collateral estoppel) and claim preclusion (i.e., res judicata) but appears to conflate the two doctrines.  (See ECF 110 at 33-37.)  Under New York and federal claim preclusion law, "a final judgment on the merits of an action precludes the parties or their privies from relitigating claims that were or could have been raised in that action."  Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286-87 (2d Cir. 2002) (citing Allen v. McCurry, 449 U.S. 90, 94 (1980)).  KeyBank does not assert that U.S. Bank could have raised its claims against KeyBank and Berkadia in the Fordham State Court Action.

[18] Berkadia asserts in a footnote that "on the merits, Torchlight will face collateral estoppel issues as to its claims that the Appraisals were 'as-is', as opposed to as-stabilized."  (ECF 115 at 20 n.11.)

court decisions in the Fordham State Court Action, which are public records.  See Giraldo v.
Kessler, 694 F.3d 161, 164 (2d Cir. 2012) (taking "judicial notice of relevant matters of public
record"); Williams v. New York City Housing Authority, 816 F. App'x 532, 534 (2d Cir. 2020)
(summary order) ("The district court did not err in considering [the plaintiff's] Article 78 petition
and state court decision because they were public records, and thus appropriate for judicial
notice.").

       In the Fordham State Court Action, the New York Supreme Court "conducted an
evidentiary hearing on the specific issue of whether the Appraisals complied with the [Fordham
Loan Modification Agreement]."  (ECF 110 at 35; see also ECF 110, Ex. 3 at 5-10.)  Based on
the appraisal reports and the testimony of experts at the hearing, the court concluded in an Order
dated February 13, 2019 (the "Supreme Court Order") that "both the Leitner and Cushman
appraisals reported 'as-stabilized' property values, and therefore," complied with the Fordham
Loan Modification Agreement.  (ECF 110, Ex. 3 at 10-11.)  The court explained that it was
"unfortunate indeed that the appraisers labeled the reports 'as is,'" but that "[t]o find that the
appraisals did not include 'as stabilized' values would be to ignore the significance or relevance
of the actual methodologies used by the appraisers."  (Id. at 10.)

       The First Department affirmed the Supreme Court Order in a decision of April 30,
2020 (the "Appellate Decision").  (ECF 110, Ex. 4.)  The Appellate Decision states:

> The plain language of the [Fordham Loan Modification Agreement]
> required that the "as-stabilized value of the Property . . . shall be
> established by the average of two MAI [Member of the Appraisal
> Institute] appraisals."  The appraisers for both parties were MAIs,
> and both parties' experts agreed that the appraisers provided "as
> stabilized" values in their direct capitalization and comparable sales
> analyses.  Despite the fact that certain portions of the appraisal
> reports were labeled "as-is" with respect to valuation, plaintiff's
> expert explained that the terms "as-is" and "as-stabilized" may be
> interchangeable when dealing with a multitenant commercial

property, and the Supreme Court did not improvidently exercise its discretion in crediting this testimony.

(Id. at 2-3.)

Collateral estoppel, also called issue preclusion, "precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." Cobb v. Pozzi, 363 F.3d 89, 113 (2d Cir. 2004) (citing Burgos v. Hopkins, 14 F.3d 787, 792 (2d Cir. 1994)).  When a federal court is called upon to determine whether a prior adjudication of an issue in a state court bars subsequent litigation in federal court, the preclusion question is answered under the collateral estoppel law of the state from which the earlier judgment was rendered.  See Hoblock v. Albany County Board of Elections, 422 F.3d 77, 93-94 (2d Cir. 2005). Therefore, in considering the preclusive effect of the Supreme Court Order and Appellate Decision, New York preclusion law applies.

Under New York law, collateral estoppel "may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate," and (3) when "the issue that was raised previously . . . [is] decisive of the present action." Curry v. City of Syracuse, 316 F.3d 324, 331 (2d Cir. 2003) (quoting Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002)).  "The party seeking the benefit of collateral estoppel bears the burden of proving the identity of the issues, while the party challenging its application bears the burden of showing that he or she did not have a full and fair opportunity to adjudicate the claims involving those issues." Khandhar v. Elfenbein, 943 F.2d 244, 247 (2d Cir. 1991).

1.  <u>Identity of the Issues.</u>

The New York courts conclusively determined that the appraisals complied with the Fordham Loan Modification Agreement because they contained "as-stabilized" valuations. The Complaint alleges that "neither of the Appraisals satisfied the terms, conditions and requirements of the Fordham Loan Agreement" because they used "as-is" valuation methodologies, and therefore the defendants breached the PSA because they failed to immediately reject the appraisals and instead proceeded towards the closing of the Refinancing Capital Event.  (See, e.g., TAC ¶¶ 71-84, 122-123, 125.)  The sixth cause of action seeks indemnification based on the defendants' acts and omissions "complained of herein," including the defendants' failure to reject the appraisals and the Refinancing Capital Event.  (TAC ¶ 165-70.)

Under the PSA, plaintiff is entitled to indemnification from the defendants only for losses arising from the defendants' "willful misfeasance, bad faith or negligence" in the performance of their obligations and duties under the PSA, "by reason of negligent disregard" of their obligations and duties, or "by reason of breach of any representations or warranties" made by them.  (PSA § 6.03(c).)  Plaintiff can only make this showing if the defendants were in fact obligated to reject the appraisals because they improperly reported "as-is" valuations.  The Court therefore concludes that plaintiff's appraisal allegations raise an identical issue of fact to the one adjudicated in the Fordham State Court Action, and the first prerequisite to collateral estoppel is met.

Plaintiff argues the issues are not identical because the factual issue of whether the appraisals were "as-stabilized" is "not the same as the issue whether KeyBank and Berkadia breached the Servicing Standard by failing to reject appraisal reports that <u>on their face</u> did not

appear to report 'as stabilized' values or that did not contain the words 'as stabilized.'"  (ECF 119 at 40 (emphasis added).)  But the Complaint does not allege that the defendants breached the PSA by failing to reject appraisals that were "facially" non-compliant – it repeatedly alleges that the appraisals in fact used "'as-is' rather than 'as-stabilized' valuation methodologies" and that "neither of the Appraisals satisfied the terms, conditions and requirements of the Fordham Loan Modification Agreement."  (TAC ¶¶ 79-81, 84, 87-88, 90-93, 95-97, 99-104.)  It also alleges that "[n]otwithstanding the clear language of the Fordham Loan Modification Agreement, each appraiser mistakenly appraised the [Fordham] Property using the 'as-is' rather than 'as-stabilized' methodology," (TAC ¶ 72), and that to read the appraisals as reporting "as-stabilized" values would be "mistaken[]," (TAC ¶ 83).

Plaintiff also provides three specific aspects of the appraisals that evince an "as-is" methodology rather than an "as-stabilized" one.  The Complaint explains that, "[a]mong other things, [each appraisal] (a) concluded that the Fordham Property was not operating at stabilized occupancy at the commencement of the valuation period; (b) concluded that the Fordham Property would take a period of time to reach stabilized occupancy; and (c) provided for a valuation dated contemporaneous with the date of the . . . [a]ppraisal, rather than a future valuation as of the date of stabilization of the Fordham Property."  (TAC ¶¶ 79-80.)  Plaintiff's attempt to recharacterize the allegations in the Complaint therefore fails.

### 2.  Full and Fair Opportunity to Litigate the Prior Proceeding.

In evaluating the second prerequisite to collateral estoppel – whether the plaintiff had a full and fair opportunity to litigate the issue in the prior proceeding – New York law dictates that "the various elements which make up the realities of litigation should be explored, including the size of the claim, the forum of the prior litigation, the use of initiative, the extent of

the litigation, the competence and experience of counsel, the availability of new evidence, indications of a compromise verdict, differences in the applicable law and foreseeability of future litigation." Kosakow v. New Rochelle Radiology Associates, P.C., 274 F.3d 706, 734 (2d Cir. 2001) (quotations omitted) (quoting Schwartz v. Public Administrator of Bronx County, 224 N.Y.2d 65, 72 (1969)); see also Curry, 316 F.3d at 332 (quoting same).

Plaintiff had a full and fair opportunity in the Fordham State Court Action to litigate the issue of whether the appraisals contained "as-stabilized" valuations. In the Fordham State Court Action, the Fordham Borrower argued that the appraisals complied with the Fordham Loan Modification Agreement in reporting "as-stabilized" values and, therefore, U.S. Bank and the Servicers were required to close the Refinancing Capital Event on June 11, 2014. (See ECF 121, Ex. B at 18.) The defendants in the Fordham State Court Action maintained that they were justified in refusing to close on June 11 because the appraisals did not report "as-stabilized" values. (Id. at 8-9.)

As previously noted, the New York Supreme Court held a "framed hearing on the issue of whether the 2014 appraisals reported 'as stabilized' property values." (ECF 110, Ex. 3 at 5.) The defendants "objected to the hearing as procedurally improper and premature" but agreed that "an ultimate issue" in the case was "whether the 'appraisals provided an as-stabilized basis' as required by the pertinent loan documents . . . or an 'as-is' basis." (Id.) The hearing took place over the course of 4 days, not including one day of summations. (Id.) The court questioned one of the appraisers (Joel Leitner) and heard expert testimony from two MAI appraisers, one called by the Fordham Borrower and one called by U.S. Bank, Torchlight, KeyBank, and Berkadia. (Id. at 5-6.) The experts provided testimony regarding both appraisals as well as the "rules, regulations and training requirements pertaining to appraisers in the real

estate industry." (Id. at 6-7.)  In this action, plaintiff U.S. Bank has conceded that, along with its co-defendants in the Fordham State Court Action, it "strenuously argued [at the hearing] that the Appraisals were not 'as stabilized.'"  (ECF 119 at 40.)

After the Supreme Court concluded the appraisals reported "as-stabilized" values, U.S. Bank and Torchlight appealed to the First Department, which affirmed the Supreme Court's conclusion.  (ECF 110, Ex. 4.)  Whether U.S. Bank had an incentive or opportunity to litigate KeyBank's and Berkadia's compliance with the PSA is irrelevant.  (See ECF 119 at 40-41.)  It had a full and fair opportunity to litigate the issue of whether the appraisals reported "as-stabilized" values, the same issue on which its claims now depend.  The second prerequisite to collateral estoppel is therefore met.

3.  Decisiveness

Finally, the issue of whether the appraisals complied with the Fordham Loan Modification Agreement is decisive with respect to the appraisal-related claims in the present action.  Each such claim, including the sixth cause of action, is predicated on the allegation that the appraisals incorrectly used "as-is" valuation methods.  However, as previously explained, the New York courts conclusively determined the appraisals contained "as-stabilized" valuations. Thus, the decisive issue with respect to the appraisal-related claims here was already decided in the Fordham State Court Action.

The third and final prerequisite to collateral estoppel is therefore met, and plaintiff's appraisal-related claims are precluded.  The last of those claims still remaining – the sixth cause of action for indemnification based on the appraisal allegations – is dismissed.

CONCLUSION

For the reasons explained, the motions to dismiss are GRANTED in part and DENIED in part.  The following claims are dismissed as time barred: (1) the second and third causes of action in their entirety; and (2) the first, fourth, fifth, and seventh causes of action to the extent they are based on the appraisals or on Lockbox-related breaches that allegedly occurred prior to March 20, 2014.  In addition, plaintiff's appraisal-related claims are barred by collateral estoppel.  Therefore, the sixth cause of action seeking indemnification based on the appraisal allegations is also dismissed.

The motions are DENIED with respect to: (1) the first, fourth, fifth, and seventh causes of action insofar as they are based on defendants' alleged failure to monitor and take appropriate action with respect to the Fordham Borrower's purported diversion of tenant rent payments from the Lockbox and into its own accounts, allegedly occurring on or after March 20, 2014; and (2) the sixth cause of action insofar as it seeks indemnification for losses incurred as a result of that alleged failure.

The Clerk is directed to terminate the motions.  (ECF 109; 113.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        March 31, 2023

56